RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0291p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

FEDERAL INSURANCE COMPANY, an Indiana corporation, as subrogee of NORVEST, L.L.C., a Michigan limited liability company and NORQUICK DISTRIBUTING COMPANY, a Michigan corporation,
*Plaintiffs-Appellants,*

*v.*

THE HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY, a Connecticut corporation,
*Defendant-Appellee.*

No. 03-2479

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-70236—Denise Page Hood, District Judge.

Argued: March 8, 2005

Decided and Filed: July 8, 2005

Before: MOORE and SUTTON, Circuit Judges; CARMAN, Judge.[*]

_____

## COUNSEL

**ARGUED:** Alan G. Gregory, GREGORY & MEYER, P.C., Troy, Michigan, for Appellants. Thomas B. Keegan, KEEGAN, LATERZA, LOFGREN & GLEASON, Chicago, Illinois, for Appellee. **ON BRIEF:** Alan G. Gregory, GREGORY & MEYER, P.C., Troy, Michigan, for Appellants. Edward W. Gleason, KEEGAN, LATERZA, LOFGREN & GLEASON, Chicago, Illinois, Michael T. Small, BETZ & BLOSS, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

CARMAN, Judge. Plaintiff-Appellant, Federal Insurance Company ("Federal"), appeals from the Memorandum Opinion and Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Summary Judgment entered by the United States District Court for the Eastern District of Michigan, Southern Division. Federal seeks equitable subrogation from

_____

[*] The Honorable Gregory W. Carman, United States Court of International Trade, sitting by designation.

Defendant-Appellee, The Hartford Steam Boiler Inspection and Insurance Company ("Hartford"), on an insurance settlement. The parties filed cross-motions for summary judgment. The District Court granted Hartford's motion and denied Federal's motion. For the reasons that follow, we **REVERSE** and **REMAND** to the District Court for specific findings as to damages.

## BACKGROUND

Federal filed suit against Hartford seeking declaratory relief and equitable subrogation and claiming breach of contract. (J.A. at 16-24.) Federal claimed a loss compensable by Hartford in excess of $1 million. The facts that precipitated this case are not in dispute.

Federal is the subrogee of Norvest L.L.C. ("Norvest") and Norquick Distributing Company ("Norquick"). Norvest leased certain property to Norquick (J.A. at 266), on which Norquick operated a frozen food storage and distribution facility (J.A. at 266). Federal's policy provides coverage – with exceptions – for Norvest/Norquick's loss to "Building Or Personal Property." (J.A. at 666.) Federal also insured Norvest/Norquick against "Business Income And Extra Expense" loss. (J.A. at 501.)

Hartford provided Norvest/Norquick with "Equipment Breakdown" coverage. (J.A. at 463.) It is from the Hartford policy that Federal seeks indemnification for the monies paid to Norquick for stock loss that was not recovered through salvage.

On January 12, 2000, a Norquick manager attempted to drain oil from an ammonia refrigeration system oil separator tank at the distribution facility. (J.A. at 266.) During the process, the handle of a "spring-operated ball valve came off from the stem." (J.A. at 267.) The parties agree that a "mechanical breakdown" occurred.[1] (J.A. at 862.) The broken handle left the valve partially open. (J.A. at 267.)

Ammonia subsequently leaked from the open valve for approximately one hour. (J.A. at 267, 310, 734-35.) The ammonia leak led to an explosion and fire. (J.A. at 310, 734-35.) The pressure from the rising levels of ammonia caused at least two walls and part of a third wall in the compressor room to fail. (J.A. at 318, 323, 679.)

Approximately seven thousand (7000) pounds of ammonia were released during the incident. (J.A. at 321.) The leaking ammonia spread throughout the compressor room and to the entire facility, including to the warehouse loading dock, the freezer, and the office area. (J.A. at 318, 321.) Hartford's expert confirmed that the "release resulted in elevated levels of ammonia in the main engine room, the loading dock, and *at least some dispersion of ammonia into the freezer compartments*." (J.A. at 884 (emphasis added).)

Federal's expert stated that it was "unlikely that any ammonia vented into the loading dock let alone the freezers *from the explosion*." (J.A. at 323 (emphasis added).) In fact, he opined that the explosion actually consumed large quantities of the escaped ammonia and served to reduce ammonia accumulation in the loading dock and warehouse. (J.A. at 323.) In this regard, Federal's expert and Hartford's expert agree. (J.A. at 884-85, 887.)

According to Hartford's expert, at the time of the explosion, the average ammonia level in the freezer area was three hundred fifty (350) parts per million ("ppm"). (J.A. at 884.) However, the ammonia levels were not uniform throughout the freezer area. Near the doors, the ammonia

---

[1]Hartford's expert report states that the "direct cause of the ammonia release at the subject plant was the failure of the Frick/Apollo spring-operated ball valve." (J.A. at 378; *see also* J.A. at 376.)

level reached as high as eight thousand (8000) ppm before the explosion.[2] (*Id.*)  The explosion may have contributed an *additional* two hundred (200) ppm of ammonia throughout the freezer and up to four thousand (4000) ppm of ammonia near the doors. (J.A. at 885.)  Ammonia carried into the freezer by water from the facility's sprinkler system, which activated when fire erupted after the explosion (J.A. at 324, 694), added an estimated six (6) ppm of ammonia to the overall average ammonia level "with higher concentrations likely near the freezer doors" (J.A. at 885). Approximately eight hours after the explosion and fire, "vapor levels inside the freezers and the offices areas . . . were too high for safe entry." (J.A. at 708.)

Due to the high levels of ammonia detected in the freezer (J.A. at 887), the U.S. Department of Agriculture ("USDA") quarantined the freezer's inventory on suspicion of ammonia contamination and temperature abuse (J.A. at 732).  Although high concentrations of ammonia were found in and on some food packaging tested by the USDA, the food was found to be safe for human consumption.[3] (J.A. at 765-66.)  Based on this conclusion, on April 7, 2000, the USDA released the food for sale on the open market. (J.A. at 767-68.)

Before the USDA released the food for sale, Norquick reported a loss to both Federal and Hartford.  Federal made two payments to Norquick.  The first payment of $2 million was made on January 24, 2000, for loss to "owned stock." (J.A. at 350.)  The payment, made under protest,  was considered an advance "made to mitigate business income loss under" the Federal policy. (J.A. at 350; *see also* J.A. at 348.)  Federal issued a second payment to Norquick on April 6, 2000, in the amount of $450,697 representing the "remainder of the stock loss." (J.A. at 351.)

On February 22, 2000, Norquick offered to repurchase the inventory from Federal for fifty cents on the dollar. (J.A. at 351.)  Federal accepted this offer. (J.A. at 351.)  After covering testing costs for the inventory, Federal received $1,218,349 from Norquick as salvage return. (J.A. at 351.)

Hartford agreed to cover the cost to replace the valve handle assembly and the cost to recharge the system with ammonia. (J.A. at 754.)  However, Hartford took the position that it was not liable for the inventory losses because any ammonia contamination to the food in the storage freezer was caused by the explosion, fire, or firefighting efforts. (J.A. at 754-55.)

## FEDERAL POLICY LANGUAGE

I.      *Business Income and Extra Expense*

The Federal policy provided coverage for "Business Income And Extra Expense." (J.A. at 501.)  Specifically, the policy insured against business income lost "due to the actual impairment of [Norvest/Norquick's] operations" and extra expenses incurred "due to the actual or potential impairment of [Norvest/Norquick's] operations." (J.A. at 501 (emphasis omitted).)  Per the terms of the policy, the actual or potential impairment must be caused by or result from "direct physical loss or damage by a **covered peril** to **property**. . . ." (J.A. at 501 (emphasis in original).)  The

---

[2] The Court notes that the Occupational Safety and Health Administration (OSHA), part of the Department of Labor, limits a worker's exposure to ammonia to fifty (50) ppm over an eight-hour work shift.   29 C.F.R. § 1910.1000(a)(2) (2003).  Further, the United States Department of Agriculture (USDA) limit for ammonia exposure is one hundred fifty (150) ppm. (J.A. at 885.)

[3] This Court notes that the report on ammonia contamination levels that was provided to the USDA by its private contractor refers to a "fire event." (*See, e.g.*, J.A. at 765.)  This report is not read as concluding that any contamination recorded was caused by a fire.  Rather, this Court accepts "fire event" as shorthand to describe the events of January 12, 2000.  The reference to a "fire event" has no bearing on the on the outcome of this case.

policy defines a "covered peril" as "a peril covered by the Form(s) shown in the Property Insurance Schedule Of Forms, except Care, Custody Or Control Legal Liability, applicable for the lost or damaged **property**."  (J.A. at 570 (emphasis in original).)

II.     *Property Insurance*

Federal also provided Norvest/Norquick with property insurance subject to certain limitations and exclusions.  (J.A. at 670-71, 674-76.)   In that policy, only the "Mechanical Breakdown" and "Ammonia Contamination" exclusions are relevant to this case.  The Mechanical Breakdown exclusion states

> This insurance does not apply to loss or damage to property caused by or resulting from mechanical breakdown of that property.
>
> This Mechanical Breakdown exclusion *does not apply to*:
> • loss or damage that results to other insured **building** or **personal property**; or
> • ensuing loss or damage caused by or resulting from a *peril not otherwise excluded.*

(J.A. at 670 (italized emphasis added; bold emphasis in original).)

> The Ammonia Contamination exclusion states
>
> This insurance does not apply to loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of ammonia from any processing equipment, plumbing system, *refrigeration system*, cooling system or heating system.
>
> This Ammonia Contamination exclusion does not apply:
> • if the discharge, dispersal, seepage, migration, release or escape of ammonia is caused by or results from any of the **specified perils**; or
> • to ensuing loss or damage caused by or resulting from a **specified peril**.

(J.A. at 674 (italized emphasis added; bold emphasis in original).)

> The Federal policy identifies the following as "specified perils":
>
> • aircraft or self-propelled missiles;
> • explosion;
> • fire or lightning;
> • leakage from fire protection equipment;
> • mine subsidence;
> • riot or civil commotion;
> • sinkhole collapse;
> • smoke;
> • vandalism;
> • vehicles;
> • volcanic action; or
> • windstorm or hail.

(J.A. at 581.)

## HARTFORD POLICY LANGUAGE

The Hartford policy provides Norvest/Norquick coverage for "Equipment Breakdown." (J.A. at 448.)  The insurance "applies to the *direct* result of an 'accident' to 'covered equipment.'" (J.A. at 448 (emphasis added).)  Per the terms of the Hartford policy, an "accident" is "direct physical loss" from a "[m]echanical breakdown, including rupture or bursting caused by centrifugal force." (J.A. at 448.)  The Hartford policy specifically provides coverage for the loss of perishable goods "due to contamination from the *release of refrigerant*, including but not limited to *ammonia*." (J.A. 449 (emphasis added).)  The Hartford policy excludes coverage for "[f]ire or combustion explosion, whether or not caused by or resulting from an 'accident'" and "[w]ater or other means used to extinguish a fire, even when such an attempt is unsuccessful." (J.A. at 464-65.)

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to grant a motion for summary judgment. *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).  In so doing, the appellate court uses the same legal standard as the district court.  *Id.*  If a denial of summary judgment is based on purely legal grounds, the appellate court also reviews the denial of summary judgment *de novo*.  *Id.*  "When a district court denies summary judgment to one party on the ground that it is granting summary judgment to another party, the denial of summary judgment is based on a legal conclusion rather than the district court's finding of a genuine issue of material fact."  *Id.* (citation omitted).  Because the District Court denied Federal's motion of summary judgment on the purely legal conclusion that it granted Hartford's motion for summary judgment, this Court reviews *de novo* both the District Court's grant of summary judgment to Hartford and its denial of summary judgment to Federal.  *See id.*

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The trial court should consider a "material fact" in dispute "genuine" if a reasonable jury could return a verdict in favor of the nonmoving party.  *Tech Dry*, 336 F.3d at 506.  We consider all factual evidence and draw all reasonable "inferences in the light most favorable to the nonmoving party."  *Id.*  The moving party bears the burden of proving that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.  *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 433 (6th Cir. 2005).  When reviewing cross-motions for summary judgment, this Court must assess each motion on its own merits.  *Tech Dry*, 336 F.3d at 506.

Jurisdiction in this case arises from the diversity of citizenship of the parties.  Michigan law governs.  *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001).

## DISCUSSION

Federal raises several issues on appeal.  Firstly, Federal argues that the District Court failed to apply the unambiguous Ammonia Contamination exclusion in Federal's policy. (Final Br. of the Appellant ("Appellant's Br.") at 11.)  Secondly, Federal states that it is not a volunteer and, therefore, is not precluded from recovering from Hartford. (Appellant's Br. at 12.)  Thirdly, Federal offers that the "other insurance" clauses of the respective policies are inapplicable or, alternatively, that the loss should be apportioned on a *pro rata* basis. (Appellant's Br. at 12.)  Lastly, Federal requests penalty interest as a result of Hartford's failure to cover Norquick's loss under the Hartford policy. (Appellant's Br. at 12-13.)

Not surprisingly, Hartford embraces the opinion of the District Court. Hartford submits that the District Court correctly refused to apply the Ammonia Contamination exclusion in Federal's policy, applied the appropriate Michigan causation standard in its review, properly ruled that Federal's policy was primary and covered the entire loss, and correctly failed to consider penalty interest. (Final Br. of the Appellee ("Appellee's Br.") at 15-18.) Hartford argues in the affirmative that Federal has failed to establish that the Ammonia Contamination exclusion in the Federal policy applies and that Federal is a volunteer and, therefore, is not entitled to equitable subrogation. (Appellee's Br. at 16-18.)

The parties' issues will be considered in turn.

I.        *Federal is not a volunteer.*

We first decide the issue of whether Federal is a volunteer. If so, Federal is not entitled to equitable subrogation. Equitable subrogation is a "legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other." *In re Lewis v. Boyd*, 398 F.3d 735, 747 (6th Cir. 2005) (citations omitted) (construing Michigan law). Equitable subrogation is a "flexible, elastic doctrine of equity." *Hartford Accident & Indem. Co. v. Used Car Factory, Inc.*, 461 Mich. 210, 215 (1999). Before granting equitable subrogation, courts should conduct an analysis based on equity jurisprudence and proceed on a case-by-case basis. *Id.*

The requirements of equitable subrogation were long ago stated by the U.S. Supreme Court. Firstly, the party seeking equitable subrogation "must have paid a debt due to a third party before he can be substituted to that party's rights." *Prairie State Bank v. United States*, 164 U.S. 227, 231, 17 S. Ct. 142, 41 L. Ed. 412 (1896) (quotation and citation omitted). Secondly, in paying the debt, "he must not act as a mere volunteer, but on compulsion, to save himself from loss by reason of a superior lien or claim on the part of the person to whom he pays the debt . . . ." *Id.* The right to equitable subrogation is "never accorded in equity to one who is a mere volunteer in paying a debt of one person to another." *Id.* "To avoid being a mere volunteer, the party seeking subrogation must have made payment in order to fulfill a legal or equitable duty owed to the subrogor." *In re Lewis*, 398 F.3d at 747.

A "volunteer" has been defined as "one who intrudes himself into a matter which does not concern him, or one who pays the debt of another without request, when he is not legally or morally bound to do so, and when he has no interest to protect in making such payment." *Detroit Auto. Inter-Ins. Exch. v. Detroit Mut. Auto. Ins. Co.*, 337 Mich. 50, 53-54 (1953) (quotation and citation omitted). Further, a "payment is not voluntary when made under compulsion, under a moral obligation, *in ignorance of the real state of facts*, or *under an erroneous impression of one's legal duty*." *Id.* at 54 (quotation and citation omitted) (emphasis added).

Federal made two payments to Norquick. The first was within two weeks after the accident and was made under protest. The second was the day before the USDA released the seized inventory for sale and approximately three months after the accident. When the first payment was made, Federal acted on the possibility that its Business Income And Extra Expense insurance would be invoked. (J.A. at 348, 350.) Federal acted quickly to mitigate its potential losses under the Business Income And Extra Expense provisions. Federal did not then know whether or to what extent the inventory might have been contaminated by ammonia. By the time the second payment

was made, there was some indication that the inventory might not have been contaminated, but the USDA report had not yet been issued.[4]

At the time each payment was made, Federal was ignorant of the "real state of facts" (concerning the later alleged ammonia contamination) and "under an erroneous impression" that it had a legal duty to compensate Norquick under the Business Income And Extra Expense provision of its policy. As such, Federal was not a volunteer, and its claim for equitable subrogation may proceed.

II.        *The Federal Ammonia Contamination exclusion applies, and Hartford's Equipment Breakdown coverage applies.*

In Michigan, courts construe insurance policies in the same manner as other contracts. *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 460 Mich. 558, 566 (1999). "A court's primary responsibility in construing a Michigan contract is to ascertain and enforce the intent of the parties." *Wonderland*, 274 F.3d at 1092 (citation omitted). The purpose of insurance is to insure against a loss. Thus, "courts should not construe a policy to defeat coverage unless the language [of the policy] requires it." *W. Cas. & Sur. Group v. Coloma Twp.*, 140 Mich. App. 516, 522 (1985).

If the provisions of a policy are clear and unambiguous, the court applies the terms in their "plain, ordinary, and popular sense." *Clevenger v. Allstate Ins. Co.*, 443 Mich. 646, 654 (1993) (citation omitted). An unambiguous contract is not open to construction and must be enforced as written. *Cochran v. Ernst & Young*, 758 F. Supp. 1548, 1554 (E.D. Mich. 1991). Whether ambiguity exists in the terms of a contract is a question of law for the court to decide. *Equitable Life Assurance Soc'y of the U.S. v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998).

"A contract is ambiguous when its terms are reasonably and fairly susceptible to multiple understandings and meanings." *Id.* (citing *Parameter Driven Software, Inc. v. Mass. Bay Ins. Co.*, 25 F.3d 332, 336 (6th Cir. 1994)). Disagreement amongst the parties as to the meaning of a contract term does not necessarily create ambiguity as a matter of law. *Steinmetz Elec. Contractors Ass'n v. Local Union No. 58 Int'l Bhd. of Elec. Workers, AFL-CIO*, 517 F. Supp. 428, 432 (E.D. Mich. 1981). To determine whether an ambiguity exists, the court must read the insurance policy as a whole. *See Murphy v. Seed-Roberts Agency, Inc.*, 79 Mich. App. 1, 8 (1977). The reviewing court should consider "all parts and every word"; "no part should be eliminated or stricken by another part unless absolutely necessary." *Workmon v. Publisher's Clearing House*, 118 F.3d 457, 459 (6th Cir. 1997).

The parties agree that a mechanical breakdown – the broken valve – occurred. The broken valve caused the release of ammonia throughout Norquick's facility. It is also clear from the record that extremely elevated levels of ammonia were present in the warehouse freezer at the time of the explosion. The parties differ over which company is responsible for the stock loss that resulted from the January 12, 2000, incident.

Because both Federal's and Hartford's policies are clear and unambiguous, this Court will interpret them using the common and ordinary meanings of their terms.

---

[4]Hartford implies that by making the second payment so close to the date the seized inventory was released, Federal must have known that the inventory was not contaminated. However, there is nothing in the record to suggest that Federal was aware of the imminent release of the inventory or of the results of the USDA review. Thus, this Court will not treat the two payments separately as Hartford urges.

A.      Federal's Ammonia Contamination exclusion applies.

The district court held, and neither party seems to dispute, that the mechanical breakdown exclusion in Federal's policy does not apply to this coverage dispute. The exclusion bars coverage for "loss or damage caused by or resulting from mechanical breakdown of that property," but the exceptions to the exclusion state that the exclusion does not apply to "loss or damage that results to other insured **building** or **personal property**." (J.A. at 670.) The perishable goods at issue in this dispute, in other words, fall under the exception to the exclusion.

Federal's main challenge to the district court's decision is that its Ammonia Contamination exclusion applies barring coverage under the policy. We agree. The Ammonia Contamination exclusion states that the "insurance does not apply to loss or damage caused by or resulting from the . . . release . . . of ammonia." (J.A. at 674.) The exclusion does not apply, however, when the release "is caused by or results from any of the **specified perils**" or when a specified peril occurs because of the release and there is "ensuing loss or damage caused by or resulting from [the] **specified peril**." (J.A. at 674.) Notably, fire and explosion are specified perils. (J.A. at 581.) By its terms, then, the policy does not cover any damage caused by ammonia contamination but does cover any damage caused by fire or explosion.

B.      Hartford's Equipment Breakdown coverage applies.

Likewise, Hartford's policy is clear and unambiguous. The Hartford policy provides coverage for direct physical loss due to an "accident." As defined by Hartford's policy, "accident" includes mechanical breakdown, which the parties concede occurred. The Hartford policy also specifically covers "loss of 'perishable goods' due to contamination from the release of refrigerant, including but not limited to ammonia." (J.A. at 449). Clearly, the Hartford policy provides coverage for loss due to ammonia contamination. However, Hartford argues that its exclusions apply to relieve it from responsibility.

The Hartford policy excludes coverage for loss or damage caused by "[f]ire or combustion explosion, whether or not caused by or resulting from an 'accident'" and "[w]ater or other means used to extinguish a fire . . . ." (J.A. at 451.) However, Hartford's own expert reported excessive levels of contamination in the warehouse at the time the explosion occurred. (J.A. at 884-88.) While the subsequent explosion and fire appear to have raised further the ammonia levels in the warehouse, the effect of any change in ammonia levels before and after the explosion and fire is a question of fact and is not subject to determination by this Court.

Hartford is not relieved of responsibility for the ammonia contamination that occurred prior to the explosion and fire even though the explosion and fire possibly raised already elevated levels of contamination in the warehouse freezer. The ammonia contamination damage and loss suffered by the inventory prior to the explosion and fire are clearly covered by Hartford's policy. Hartford is relieved of obligation for any *additional* ammonia contamination to the inventory resulting from the explosion, fire, or water (or other means) used to fight the fire. However, the record is unclear as to what – if any – ammonia contamination damage occurred to the inventory prior to the explosion, fire, and firefighting efforts. The record is also unclear about whether the explosion, fire, and firefighting efforts contributed to any ammonia contamination suffered by the inventory. These are questions of fact. As a result, we remand this case to the District Court for a specific determination as to damages.

The District Court is directed to determine the following:

1.	Whether the inventory was contaminated by ammonia prior to the explosion, fire, and firefighting efforts;

2.	If so, the amount of inventory loss (in dollars) attributable to the ammonia contamination that occurred prior to the fire, explosion, and firefighting efforts;

3.	Whether the inventory suffered additional ammonia contamination as a result of the fire, explosion, firefighting efforts, or any combination of the foregoing;

4.	If so, the amount of inventory loss (in dollars) attributable to the ammonia contamination that occurred as a result of the fire, explosion, firefighting efforts, or any combination of the foregoing;

5.	Whether the inventory was further contaminated by ammonia *after* the explosion, fire, firefighting efforts, or any combination thereof but *not* as a result of the fire, explosion, firefighting efforts, or any combination thereof; and

6.	If so, the amount of inventory loss (in dollars) attributable to the ammonia contamination that occurred *after* the explosion, fire, firefighting efforts, or any combination thereof but *not* as a result of the fire, explosion, firefighting efforts, or any combination thereof.

Hartford will compensate Federal only for those calculated inventory losses due to ammonia contamination that occurred *not* as a result of the fire, explosion, firefighting efforts, or any combination thereof, whether or not prior or subsequent to the fire, explosion, and firefighting efforts.

C.	This Court's preceding analysis is consistent with Michigan common law concerning causation in the insurance context.

The causation standard applied in tort cases is not the same as that applied in an insurance case. *See Vanguard Ins. Co. v. Clarke*, 438 Mich. 463, 466 n.3 (1991) (citing *Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47, 53 (1918)); *Pac. Employers Ins. Co. v. Mich. Mut. Ins. Co.*, 452 Mich. 218, 224 (1996). The esteemed Judge Cardozo wrote the *Bird* opinion. In *Bird*, Judge Cardozo stated that "[c]ausation is not a chain but a net. At each point, influences, forces, events, precedent and simultaneous, meet, and the radiation from each point extends indefinitely." *Bird*, 224 N.Y. at 51 (citation omitted). From this "complex web," the law selects one cause or another. *Id.* "The same cause producing the same effect may be proximate or remote as the contract of the parties seems to place it in light or shadow." *Id.* Ultimately, in insurance cases, the court is not to trouble itself with distant causes. *Id.* at 53 (citation omitted); *see also Clarke*, 438 Mich. at 466 n.3; *Lansing Bd. of Water & Light v. Deerfield Ins. Co.*, 183 F. Supp. 2d 979, 986 (W.D. Mich. 2002) ("[T]he cause of a claim under Michigan law is only a close cause, and not a distant one, with respect to insurance cases.")

Our conclusion is consistent with Michigan precedent, which we find the District Court misapplied. In *Mich. Sugar Co. v. Employers Mut. Liab. Ins. Co. of Wis.*, the Michigan court of appeals faced a similar situation. 107 Mich. App. 9 (1981) ("*Michigan Sugar*"). The plaintiff operated a large sugar silo with heated floors that served to eliminate moisture. The plaintiff entered into an "all-risk" insurance policy that excluded in subsection 4(k) loss by

shrinkage, evaporation, loss of weight, contamination, change in flavor, color, texture, or finish, *change in temperature (whether or not atmospheric)* or humidity (but excepting loss by or resulting from freezing of automatic sprinkler, fire hydrant, standpipe, plumbing or heating systems) rust or corrosion; unless loss by fire or explosion not otherwise excluded ensues, and then the [insurance] Company shall be liable only for such ensuing loss. . . .

*Id.* at 12 (emphasis added). During the period of coverage, a worker at the facility noticed that sugar was bubbling at the top of the mound of sugar and running down the sides like lava. *Id.* The phenomenon was caused by the sugar having overheated. The silo full of sugar was a total loss. After an investigation, the insurance company determined that the thermostat controlling the in-floor heating system and the heating cables had been improperly installed. *Id.* at 13. On the basis of the policy's temperature exclusion, the insurance company then denied coverage for the loss.

The *Michigan Sugar* court noted that the "'qualifying language of the contract may properly be interpreted to mean that the parties intended efficient, proximate cause to be the ultimate test of liability.'" *Id.* at 14 (quoting *Kangas v. N.Y. Life Ins. Co.*, 223 Mich. 238, 244 (1923).) The court then restated the definition of proximate cause as "that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred." *Michigan Sugar*, 107 Mich. App. at 14 (quotation and citation omitted). The court concluded that the "improper installation of the silo's heating apparatus was a proximate cause of the damage to plaintiff's sugar." *Id.* at 15. The court went on to state that

This conclusion does not, however, compel the further finding that the plaintiff's claim is compensable under its insurance contract with [the insurer]. The *exclusions in subsection 4(k), we believe, encompass the plaintiff's loss and bar liability under the contract*.

*Id.* (emphasis added). The court reasoned that subsection 4(k) of the policy was clear and unambiguous and excluded from coverage "damage to the sugar caused by a change in temperature 'whether or not atmospheric'" except that resulting from freezing. *Id.* at 16-17. Because the loss was due to overheating not freezing, the policy exclusion barred coverage. *Id.* at 17.

On the basis of *Michigan Sugar*, this Court need not reach the issue of the proximate cause in the present matter. It is sufficient that Federal's policy unambiguously excludes coverage for the losses alleged. Similar to the policy in *Michigan Sugar*, the Federal policy excludes from coverage losses caused by ammonia contamination.

However, our preceding holding does not entirely settle this matter. We find that the record does not establish the extent and amount to which Federal suffered compensable damages. On that issue alone, we remand this case to District Court for further proceedings consistent with this opinion.

III.     *The "other insurance" provisions of the parties' contracts are not relevant to the determination in this case.*

Both the Federal and Hartford policies include "other insurance" clauses. "Other insurance" clauses are provisos in insurance policies intended to "vary or limit the insurer's liability when additional insurance coverage can be established to cover the same loss." *St. Paul Fire & Marine Ins. Co. v. Am. Home Assurance Co.*, 444 Mich. 560, 564 (1994). The purpose of such provisions is to "protect the insurer from the moral hazards of fraud and carelessness incident to the over-insurance of property." *Id.*

Federal's "other insurance" clause states

> If you have other insurance against loss or damage covered by this policy, we shall
> not pay any amount greater than the *proportion* that the applicable Limit Of
> Insurance shown in the Declarations bears to the total applicable Limits Of Insurance
> covering the loss or damage.

(J.A. at 673 (emphasis added).)  This is known as a "*pro rata*" clause.  "*Pro rata*" clauses are
"generally intended to become effective only when other valid and collectible primary insurance is
available." *St. Paul Fire*, 444 Mich. at 566-67.

On the other hand, Hartford's policy is an "excess" clause:

> If there is other insurance covering the same loss or damage, other than that
> described in (a) above, we will pay only the amount of covered loss or damaged [sic]
> *in excess* of the amount due from that other insurance, whether you can collect on it
> or not.

(J.A. at 467 (emphasis added).)  "Excess" "other insurance" clauses are generally intended to "afford
secondary coverage when the same loss is covered by 'other insurance.'" *St. Paul Fire*, 444 Mich.
at 568.

We need not reach the "other insurance" language of the policies.  In this case, Hartford's
policy covers inventory losses caused by ammonia contamination except those resulting from fire,
explosion, and firefighting efforts.  On the other hand, Federal's policy excludes *all* inventory loss
caused by the alleged ammonia contamination.  Therefore, the policies do not cover the same loss
or damage.  Consequently, the parties' "other insurance" clauses do not come into effect.

IV.     *Federal is not entitled to penalty interest.*

Michigan law provides penalty interest if an insurer fails to pay a claim on a timely basis and
(1) the "claim is not reasonably in dispute," (2) "the insurer has refused payment in bad faith," and
(3) "the bad faith was determined by a court of law."  Mich. Comp. Laws Ann. § 500.2006(4)
(2004).  Federal asserts that it is entitled to interest pursuant to this provision due to Hartford's
failure to pay its claim for ammonia contamination damage to Norquick's inventory.  The District
Court rejected Federal's argument.  (J.A. at 205.)  This Court does as well.

"The purpose of the penalty interest statute is to penalize insurers for dilatory practices in
settling meritorious claims, not to compensate a plaintiff for delay in recovering benefits to which
the plaintiff is ultimately determined to be entitled." *Arco Indus. Corp. v. Am. Motorists Ins. Co.*,
233 Mich. App. 143, 148 (1998) (citation omitted).  In order to be eligible for penalty interest,
Federal first must prove that the claim was not "reasonably in dispute." *See Siller v. Employers Ins.
of Wausau*, 123 Mich. App. 140, 143-44 (1983).

Whether a claim is "reasonably in dispute" is a question of law for the court to decide. *See
Jones v. Jackson Nat'l Life Ins. Co.*, 819 F. Supp. 1372, 1379 (W.D. Mich. 1993), aff'd 27 F.3d 566
(6th Cir. 1994).  The *Jones* court indicated that a plainly invalid contract clause or a plainly
erroneous interpretation of law may be sufficient basis for the court to determine that a policy is not
"reasonably in dispute." *Id.*  However, when there is no indication that the insurer acted
unreasonably or with dilatory motive in denying the claim, the court should find that the claim is
"reasonably in dispute." *Id.*  A policy also might be "reasonably in dispute" when the insurer – in
good faith – disputes its obligation, contests legitimate issues, and makes no effort to delay recovery
of benefits. *Arco Indus.*, 233 Mich. App. at 148-49.

Based on the record before this Court, we find no indication that Hartford acted unreasonably or with dilatory motive. The contract clauses are not plainly invalid nor is there a plainly erroneous interpretation of the law before us. It appears that Hartford reasonably disputed its obligation, contested legitimate issues, and did not attempt to delay recovery of benefits. Thus, this Court finds that the claim was reasonably in dispute. Accordingly, Federal is not entitled to penalty interest pursuant to Mich. Comp. Laws Ann. § 500.2006(4).[5]

### CONCLUSION

For the foregoing reasons, this Court rules that Federal is not a volunteer; that Federal's Ammonia Contamination exclusion operates to deny coverage for inventory loss resulting from ammonia contamination; that Hartford's policy specifically provides coverage for the ammonia contamination losses not resulting from fire, explosion, and firefighting efforts; that the parties' "other insurance" clauses have no effect in this case; and that Federal is not entitled to penalty interest. We **REVERSE** and **REMAND** this case for further proceedings as to damages. The District Court is directed to determine the following:

1.   Whether the inventory was contaminated by ammonia prior to the explosion, fire, and firefighting efforts;

2.   If so, the amount of inventory loss (in dollars) attributable to the ammonia contamination that occurred prior to the fire, explosion, and firefighting efforts;

3.   Whether the inventory suffered additional ammonia contamination as a result of the fire, explosion, firefighting efforts, or any combination of the foregoing;

4.   If so, the amount of inventory loss (in dollars) attributable to the ammonia contamination that occurred as a result of the fire, explosion, firefighting efforts, or any combination of the foregoing;

5.   Whether the inventory was further contaminated by ammonia *after* the explosion, fire, firefighting efforts, or any combination thereof but *not* as a result of the fire, explosion, firefighting efforts, or any combination thereof; and

6.   If so, the amount of inventory loss (in dollars) attributable to the ammonia contamination that occurred *after* the explosion, fire, firefighting efforts, or any combination thereof but *not* as a result of the fire, explosion, firefighting efforts, or any combination thereof.

Hartford will compensate Federal only for those calculated inventory losses due to ammonia contamination that occurred *not* as a result of the fire, explosion, firefighting efforts, or any combination thereof, whether or not prior or subsequent to the fire, explosion, and firefighting efforts.

---

[5] Despite this holding, Federal's penalty interest claim would fail because Federal has failed to demonstrate the required "bad faith" on the part of Hartford. Mich. Comp. Laws Ann. § 500.2006(4). "Bad faith" in the context of this statute is defined as "not simply negligence or bad judgment but rather the conscious doing of a wrong because of dishonest purpose or moral obliquity. It is not merely the lack of good faith, but the opposite of good faith." *Medley v. Canady*, 126 Mich. App. 739, 748 (1983). We have no evidence of dishonest purpose or moral obliquity in Hartford's denial of coverage in this matter.