**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0219n.06

**No. 11-1525**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Mar 04, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MARK BRIGOLIN; BELINDA BRIGOLIN; TIFFANY BRIGOLIN; MARIA ROBERTS; MARSHA ROBERTS; NANCY RUMMERS; JERRY RUMMERS; RONNA RUMMERS; DAROL BIDWELL; KELLEY BIDWELL; JENNIFER BUCK; RAJESH DAGLI; POOJA DAGLI; CARA EGAN; MAUREEN EGAN; LEE ANN LEIGH; WILLIAM LEIGH; DAVID LEWIS; MARJORIE LEWIS; JESSICA LEWIS; HANNAH MILLER; TAMMY MILLER; RENEE MORRIS; JOHN PUROLL; HILARY PUROLL; BRIDGET VIS; WILLIAM VIS; CARRIE ARNOLD; ANDREA LORFEL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Plaintiffs-Appellants, | ) ) | OPINION |
| v. | ) ) | |
| BLUE CROSS BLUE SHIELD OF MICHIGAN, | ) ) ) | |
| Defendant-Appellee. | ) ) | |

Before: GUY, DAUGHTREY, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge**.  Female members of several Blue Cross Blue Shield

of Michigan (BCBSM) health insurance plans allege the insurer breached their contracts and denied

them benefits in violation of the Employee Retirement Income Security Act of 1974 (ERISA), 29

U.S.C. §1001 et seq., when it refused to pay for facility-based treatments for their eating disorders.

No. 11-1525
*Brigolin, et al. v. Blue Cross Blue Shield of Michigan*

They appeal the district court's entry of summary judgment against them. This case does not concern the potentially life-threatening nature of these disorders, which no one disputes. The only issue is whether the insurer was required to provide the treatments the women sought. We conclude it was not and **AFFIRM**.

## I. BACKGROUND

Plaintiffs are a putative class of women diagnosed with recognized eating-disorder diseases who are members or beneficiaries of health insurance plans that BCBSM administers or underwrites. One group of plan participants—including Tiffany Bidwell, Jennifer Buck, Pooja Dagli, Cara Egan, Andrea Lorfel, Hannah Miller, Renee Morris, Hillary Puroll, and Bridget Vis—receive coverage under BCBSM plans that are subject to regulation under ERISA. Other participants—including Tiffany Brigolin, Carrie Arnold, Lee Ann Leigh, Jessica Lewis, Maria Roberts, and Ronna Rummer—are members of plans that are not subject to ERISA.[1] The plaintiffs all claim that BCBSM refused to pay for eating-disorder treatments they received at out-of-state residential facilities, even after a medical doctor determined such treatment was necessary. The parties do not dispute the grave nature of eating disorders and agree that they are medically recognized diseases.

In the court below, the plaintiffs asserted a single breach-of-contract claim alleging that the coverage denials violated their legally binding agreements with BCBSM. However, they did not take the well-tread path of citing one or more contractual provisions that BCBSM allegedly breached. Instead, they argued that because they neither saw nor signed a BCBSM contract—and so had no

---

[1]The district court's order refers to Roseanne Potashnik as one of the plaintiffs. However, Potashnik is not named in the complaint and the parties do not address her claims on appeal. As a result, we assume she is not a party to this case.

knowledge of any exclusions in it—their coverage terms were established by BCBSM's written advertisements and communications, which led them to believe BCBSM would cover "any and all" medically required treatments. Relying on a page from BCBSM's website, they also maintained that BCBSM must pay for services they receive from any provider as long as that provider contracts with any Blue Cross Blue Shield entity, rather than with BCBSM.

The parties both moved for summary judgment. The district court analyzed the claims of the non-ERISA plan participants as breach-of-contract claims under Michigan law, and construed the ERISA plan participants' demand as an action seeking to recover benefits under the statute. After briefing and oral argument, the district court granted only BCBSM's motion for summary judgment. Plaintiffs moved the court for reconsideration, which it denied. This appeal followed.

## II. DISCUSSION

### A. Standard of review

We review a district court's grant of a motion for summary judgment de novo. *Milligan v. United States*, 670 F.3d 686, 696 (6th Cir. 2012). Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We consider the admissible evidence in the light most favorable to the non-moving party. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). If the moving party has carried

its burden, the nonmovant must show that there is more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The district court applied both Federal Rule of Civil Procedure 12(b)(6) and 56(c) in its analysis of the parties' motions, and partially disposed of the plaintiffs' claims under Rule 12(b)(6). The district court erred in doing so because its consideration of matters outside the pleadings required it to convert the Rule 12(b)(6) motion to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). This error does not affect our review of the case, however, as we may ignore the label attached to the proceeding and properly treat it as one for summary judgment. *United Bhd. of Carpenters & Joiners of Am., Dresden Local No. 267 v. Ohio Carpenters Health & Welfare Fund*, 926 F.2d 550, 558 (6th Cir. 1991).

**B.  Analysis**

### 1.  The non-ERISA plaintiffs' breach-of-contract claim

To recover on a breach-of-contract claim under Michigan law, the non-ERISA plan participants must establish the existence of a valid contract, the terms of the contract, the actions that breached these terms, and the injury the breach caused to them. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003). These plaintiffs do not deny the existence of valid contracts with BCBSM. Instead, they argue they were unaware of the contracts' terms because they did not receive the agreements defining their benefits and conditions of coverage. They rely upon BCBSM's advertisements and definitions of terms found outside of each agreement to give meaning to the contract itself.

We begin by reviewing the relevant terms of the three different BCBSM plans under which the six non-ERISA plan participants received coverage, before turning to an analysis of their claims.

First, the Comprehensive Hospital Care Group Benefit plan (the Comprehensive Plan) provided coverage for plaintiffs Brigolin and Roberts. Under this agreement, the insured's contract consists of a plan certificate, any amendments or riders that may modify its terms, the insured's application, and his or her BCBSM identification card. The Comprehensive Plan also defines relevant contract terms. "Covered Services" are the services, treatments, or supplies identified as payable in the insured's certificate. "Exclusions" are those situations, conditions, or services that are not covered by the subscriber's certificate. And a "participating provider" is a hospital, physician, and other licensed facility or health care professional who has signed a participation agreement with BCBSM agreeing to accept the approved charge as payment in full. (Conversely, a "nonparticipating provider" does not have a participation agreement with BCBSM.) Further, the Comprehensive Plan limits coverage for services provided by nonparticipating facilities, warning that an insured "will need to pay most of the charges" if he or she goes to a nonparticipating hospital or facility. Finally, it explicitly excludes coverage of services not included in the plan documents.

Pursuant to the Comprehensive Plan's terms, BCBSM paid for many of Brigolin's anorexia-related facility claims that various hospitals submitted. But BCBSM denied Brigolin's claims for services at one facility because it determined the services were not medically necessary and the facility, Remuda Ranch, was a nonparticipating provider. BCBSM also paid for many facility-based services Roberts received for her eating disorder, but similarly denied her claims at Remuda Ranch because it was a nonparticipating residential facility.

The second plan under which non-ERISA plan participants received benefits, the Community Blue Group Benefit plan (the Community Blue Plan), provided coverage to plaintiffs Arnold and

Rummer. The same components that make up an insured's contract under the Comprehensive Plan comprise the Community Blue Plan. Definitions of key terms are substantially similar in both plans. The Community Blue Plan likewise limits coverage for services provided by nonparticipating facilities, but further specifies that BCBSM does not pay for services at nonparticipating mental health or substance abuse treatment facilities. Finally, just like the Comprehensive Plan, the Community Blue Plan excludes coverage of services not included in it.

BCBSM denied Arnold's eating-disorder-related facility claims submitted by the Center for Hope of the Sierras because it was a nonparticipating residential treatment facility whose services were not covered under the Community Blue Plan's inpatient hospital benefit. As to Rummer, BCBSM stated that it had no records of any denied facility claims under her policy.

Finally, plaintiffs Leigh and Lewis received benefits under the Individual Care Blue PPO (the Individual Plan), the third plan at issue. The Individual Plan certificate includes similar descriptions of the contract's components and definitions of key terms as those found in the two plans described above. Also like those plans, the Individual Plan limits coverage for services provided at nonparticipating facilities and excludes services not explicitly described in the plan.

BCBSM paid claims for eating-disorder-related services Leigh received at two facilities but denied her claims for services rendered by an out-of-state nonparticipating facility. BCBSM also paid for some of Lewis's eating-disorder-related facility claims, but denied payment in two instances for non-contracted services performed at Spectrum Health Hospitals (although other services Spectrum provided were reimbursed). Finally, BCBSM denied a claim for services provided at

Remuda Ranch because BCBSM deemed it a nonparticipating, residential facility whose care did not meet the plan's hospital inpatient admission requirements.

To summarize: six non-ERISA plan participants received coverage under three different BCBSM plans. Each plan distinguishes participating providers from nonparticipating providers. Each plan also defines "covered services" as those that are specifically identified as payable and excludes those not included in the agreement. With the exception of Rummer (for whom BCBSM has no record of denied claims), BCBSM refused to pay for eating-disorder-related services these plaintiffs received primarily because they were provided by nonparticipating facilities or providers.

Having identified the relevant terms, we begin our analysis with the governing law. The goal of contract interpretation is to honor the parties' intent. *Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 857 (Mich. Ct. App. 2008). Michigan courts treat insurance policies just like other contracts. *Fed. Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co.*, 415 F.3d 487, 495 (6th Cir. 2005). Contract terms must be construed in their plain, ordinary, and popular sense if they are clear and unambiguous. *Id*. We must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). And while we are required to strictly construe exclusionary clauses in favor of the insured, explicit exclusions may legitimately serve as a basis to deny a claim. *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 434 (Mich. 1992). Thus, if the binding terms in their BCBSM contracts unambiguously exclude claims for services at nonparticipating facilities, as well as services not included in the plan agreements, the non-ERISA plaintiffs' breach-of-contract claims must fail. We turn to that analysis.

No. 11-1525
*Brigolin, et al. v. Blue Cross Blue Shield of Michigan*

These plaintiffs claim an entitlement to coverage for *any* services provided by *any* facility or provider that contracts with *any* Blue Cross Blue Shield affiliate. They do so on two bases. First, they (inaccurately) assert that BCBSM has not defined the term "nonparticipating" in its contracts. They offer instead two alternatives sources to furnish its meaning. The first is a definition of "participating provider" found on BCBSM's website, which it describes as "a facility or other provider that contracts with the Blues to provide care or services to members under specific reimbursement terms." Plaintiffs offer affidavits from managers of several eating-disorder treatment facilities that contract with Blue Cross Blue Shield entities outside of Michigan who state that their facilities are "participating providers" with other state affiliates, though not BCBSM. Second, these plan participants claim that BCBSM's written advertisements and communications established their coverage terms and led them to believe BCBSM would "cover any and all medically required treatments." They read these two sources together to conclude they are entitled to *any* services that *any* facility or provider renders pursuant to a contract with *any* Blue Cross Blue Shield affiliate.

Plaintiffs are mistaken. Fatal to their claim is the fact that each applicable certificate unambiguously defines "participating provider" or "participating facility" as those providers that "have signed a participation agreement with BCBSM agreeing to accept the approved charge as payment in full." The affidavits the plaintiffs produced do not suggest that the facilities at which they received services are "participating providers" with BCBSM. The insurer's affidavits, by contrast, state that the facilities in question do not have participation agreements with BCBSM.

With respect to advertisements, there is no need to resort to extrinsic sources to interpret an agreement whose terms are unambiguous. Michigan courts adhere to the common-law view that a

contract is only ambiguous "if two provisions of the same contract irreconcilably conflict with each other." *Klapp*, 663 N.W.2d at 453. Only then is extrinsic evidence admissible to help construe disputed terms. *Id*. at 454. But absent ambiguity, the contract is construed by its terms alone. *Id*. Here, there is no reason to consider whether BCBSM's advertisements altered the definition of "participating provider," as the term's meaning is sufficiently clear in BCBSM's agreements. Moreover, the definition the plaintiffs offer is plainly at odds with dozens of pages of policy exclusions detailing services BCBSM does not cover. Because no relevant ambiguity exists in the terms of these contracts, we don't need to consider extrinsic sources to interpret them.

Similarly, the use of the term "participating provider" from BCBSM's website that the plaintiffs put forward is irrelevant. While the website's definition is not a model of clarity, it does not make the meaning of "participating provider" ambiguous or supersede the express limitations BCBSM's contracts impose on it. It is impermissible to introduce the website definition as parol evidence where, as here, the effect is to contradict the contracts' terms, not to explain them. This attempt to broaden the meaning of "participating provider" is unavailing.

The non-ERISA plaintiffs also argue BCBSM is required to pay for in-patient residential treatment for eating-disorder diseases because their policies do not specifically exclude payment for these services. They rely on a single case, *Linebaugh v. Farm Bureau Ins.*, 569 N.W.2d 648 (Mich. Ct. App. 1997), to support their position. *Linebaugh* concerned whether an insured motorist's settlement of a claim without his insurance company's consent permitted him to make a claim under the policy, which contained a provision stating that claims settled without the company's consent would not be covered. 569 N.W.2d at 649. The court held that the plaintiff's conduct fell squarely

within the policy exclusion, and rejected the plaintiff's argument that the insurer must show that the exclusion was either reasonable or would prejudice the insurer if it were not enforced. *Id*. at 652–53. Rather than supporting the plaintiffs' position here, *Linebaugh* only reaffirms the general rule that courts should give effect to policy exclusions. No other authority has been cited supporting the claim that all terms not specifically excluded in an insurance contract are implicitly included in it.

Moreover, the construction offered works damage on other provisions of the agreements with BCBSM. It negates the exclusionary clause, which states that services not included in the certificates are excluded from coverage. It also hollows out the meaning of "covered services," which each certificate defines as those services that are identified as payable. Beyond that, it runs afoul of Michigan law, which does not permit a court to construe a contract in a way that renders any part of it nugatory. *Klapp*, 663 N.W.2d at 453. And, finally, it would require BCBSM to exhaustively list every conceivable medical service that its policies do *not* cover, which the plaintiffs concede is practically impossible for BCBSM to do. More to the point, the law does not require it.

We also reject the plaintiffs' insistence that the contractual limitations in their policies do not apply because they were unaware of the terms of BCBSM's coverage. While they admit entering into valid contracts with BCBSM, the plaintiffs argue they did not know of the contracts' particulars. The facts and the law, however, belie their claim.

The record demonstrates the plaintiffs had actual notice that their policies were not unlimited. BCBSM introduced evidence that the identification cards provided to their insureds contain disclosure language referring to coverage limits. Prior to 2006, for example, the Community Blue Plan identification card stated that use of it is "subject to terms and applicable contracts, certificates,

and riders." The instructions currently indicate similar limitations and advise of a phone number participants can call to locate participating providers outside of Michigan. According to BCBSM, such language is commonly found on the back of its identification cards. Plaintiffs admit they received BCBSM identification cards and do not dispute BCBSM's characterization of their contents. Consequently, they had notice that their coverage was limited.

Moreover, as a legal matter, Michigan courts have "historically held an insured to have knowledge of the contents of the policy, in the absence of fraud, even though the insured did not read it." *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 42 n.82 (Mich. 2005) (citing cases). There is no allegation of fraud, nor a claim that BCBSM hid contractual terms. Given this, the plaintiffs cannot both admit the policies are legally binding and, in the same breath, disclaim their terms.

To sum up: the district court properly held the claims of the non-ERISA plaintiffs could not withstand summary judgment.[2] Each contract excludes claims for services at nonparticipating facilities, as well as coverage of services not included in the plan. There is no showing that allegedly conflicting definitions on BCBSM's website should control over the policy certificates, nor have these plaintiffs established that the terms of their policies were ambiguous. So resort to extrinsic sources is unnecessary. Finally, ignorance of policy limitations the plaintiffs admit are legally binding does not support their contention that BCBSM provided unlimited coverage. There exists no genuine issue of material fact as to whether BCBSM improperly denied their claims for services rendered by nonparticipating providers. The grant of summary judgment to BCBSM was proper.

---

[2]The district court omitted mention of Rummer in its disposition of the non-ERISA plaintiffs' claims, presumably because Rummer did not provide evidence of denied claims. Our reasons for affirming summary judgment as to the non-ERISA plaintiffs apply with equal force to Rummer.

No. 11-1525
*Brigolin, et al. v. Blue Cross Blue Shield of Michigan*

## 2. The ERISA plaintiffs' claims for benefits

Like all of the plaintiffs in this matter, each ERISA plan participant filed a state-law breach-of-contract claim against BCBSM for failing to pay for benefits under their respective plans. Regardless of how it is styled, though, "a suit by a beneficiary to recover benefits from a covered plan . . . falls directly under § 502(a)(1)(B) of ERISA, which provides an exclusive federal cause of action for resolution of such disputes." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 62–63 (1987).[3] Such an action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

When claims are denied, ERISA plans are required to "afford . . . a full and fair review by the appropriate named fiduciary of the decision denying the claim." *Id*. § 1133. Although ERISA

---

[3]The district court held that ERISA preempts the ERISA plan participants' state-law breach-of-contract claim under *both* 29 U.S.C. §§ 1132(a)(1)(B) and 1144. The district court was correct as to the application of § 1132(a), but § 1144 has no bearing here. ERISA can preempt state-law claims either by way of complete preemption under § 1132(a) or express preemption under § 1144. If a claim is completely preempted under § 1132(a), the suit containing those claims may be removed to federal court because the completely preempted state-law claim "arises under" federal law, vests the district court with federal-question jurisdiction, and authorizes an amendment of the complaint to attempt statement of an ERISA claim. *Wright v. Gen. Motors Corp.*, 262 F.3d 610, 613 (6th Cir. 2001). Express preemption under § 1144, on the other hand, covers a claim that "relates to" an employee benefit plan, but—because it does not fall within ERISA's civil enforcement regime—does not provide ERISA jurisdiction and is simply a defense that is grounds for dismissal, not removal. *See id.* at 614–15; *Warner v. Ford Motor Co.*, 46 F.3d 531, 533–35 (6th Cir. 1995) (en banc). The district court correctly concluded that the ERISA plan participants' state-law claim could be construed as a claim for benefits under ERISA which the court had jurisdiction to hear. But § 1144 does not apply. If it did, the district court would lack jurisdiction to consider the claim on its merits. *See generally Loffredo v. Daimler AG*, No. 11-1824, 2012 WL 4351358, at *8–9 (6th Cir. Sept. 25, 2012) (Moore, J., concurring).

does not expressly require exhaustion of administrative remedies to bring suit, the Sixth Circuit has read such a requirement into the statute's administrative scheme. *See Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 504 (6th Cir. 2004). Exceptions to this requirement exist, though. If resort to a plan's appeals procedure would be futile or the remedy inadequate, for example, a plaintiff need not exhaust administrative remedies. *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998). If a party pleads futility, the burden is on her to show by a "clear and positive indication" that her claim will be denied on appeal. *Id*.

A district court reviews a denial of benefits claim under § 502(a)(1)(B) "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In such a case, the district court applies the deferential arbitrary and capricious standard. *Haus v. Bechtel Jacobs Co., LLC*, 491 F.3d 557, 561 (6th Cir. 2007). We review de novo a district court's determination of which standard applies. *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 807 (6th Cir. 2002).

As a preliminary matter, we reject the ERISA plaintiffs' contention that we should not distinguish between ERISA and non-ERISA plan participants because the analysis for each group is the same. It is not. Plaintiffs have not explained why ERISA does not apply and provide no legal authority to support their view. Moreover, the record contains plan documents and BCBSM employee affidavits detailing the plan participants who were members or beneficiaries of ERISA plans and those who were not. As ERISA governs the benefit plans in question, we turn to an

analysis of the claims of three subgroups of ERISA plaintiffs: those with exhausted claims, those with unexhausted claims, and those who provided no evidence of having made a claim.

We first examine the claims of the lone ERISA plaintiff who properly exhausted her administrative remedies. Cara Egan appealed the denial of her claims for services at Avalon Hills, a residential eating-disorder treatment facility. Because Egan's plan gives discretion to BCBSM as its claims administrator to construe the terms of her agreement and to determine questions pertaining to benefit eligibility, we review BCBSM's denial under the arbitrary and capricious standard. *See Haus*, 491 F.3d at 561.

By its terms, Egan's Community Blue Plan generally excludes coverage for services at nonparticipating hospitals, facilities, and alternative to hospital care facilities, as well as services rendered by nonparticipating mental health treatment facilities. BCBSM denied Egan's claims on two bases. First, BCBSM noted that Avalon Hills was a nonparticipating facility. Also, after reiterating a dozen hospital and facility care services that Egan's policy covers, BCBSM concluded that the facility where Egan received care does not meet the Community Blue Plan's criteria for covered hospital services. Egan has not identified another term of her plan that extends coverage to Avalon Hills or explained why the insurer's decision on the articulated bases was arbitrary or capricious. Egan is not entitled to relief on her claim.

We next review the claims of the ERISA plan participants who did not exhaust their claims, including plaintiffs Bidwell, Dagli, Lorfel, Purroll, and Vis.[4] Each of these individuals (1)

---

[4]The district court included Buck in this group, but dismissed her claim because she produced no evidence that BCBSM denied her claim for services at a nonparticipating residential facility. We group Buck's claim with the other ERISA plaintiffs who did not present evidence of denied claims.

participated in an ERISA plan; (2) sought reimbursement from BCBSM for residential services for treatment related to an eating disorder; (3) was denied reimbursement because the services were provided by a nonparticipating facility or because BCBSM did not precertify the service; and (4) did not avail herself of the available appeals process for claim denials. These plaintiffs do not dispute that they failed to exhaust their administrative remedies, but argue instead that they should be excused from doing so because it would have been futile. They characterize BCBSM's appeals process as a "sham," surmise that BCBSM's "paper reviews" will always result in claim denials, and rest on conclusory allegations in their pleadings to support their argument.

An allegation that an appeal would have been futile, without more, is inadequate to excuse a failure to exhaust administrative remedies. *Fallick*, 162 F.3d at 419. Moreover, the record here actually undercuts the futility argument. For example, the plaintiffs submitted an affidavit describing the appeal gauntlet one insured had to run after BCBSM denied payment for his daughter's eating-disorder treatment at Remuda Ranch. Though the process made him "extremely frustrated and angry," BCBSM ultimately approved a portion of the disputed charges. In another example, BCBSM's case management program—which allows medically necessary residential treatment for eating disorders to be paid on an individualized basis, even if a facility does not have a participation agreement with BCBSM—referred 28 cases since 2002 to residential treatment programs similar to those at issue here. Indeed, as plaintiffs' counsel conceded at oral argument, BCBSM paid for one non-ERISA plaintiff's residential treatment through this program. In sum, the plaintiffs' assertion of futility is unavailing against evidence that refutes it. We deny their claims without prejudice.

We conclude with a review of the claims of the final subgroup of ERISA plaintiffs who provided no evidence that BCBSM denied payment for services they received at nonparticipating residential facilities. The pleadings allege that BCBSM denied such payments for plaintiffs Buck, Miller, and Morris. The district court ordered them to provide all disputed claim denials that formed the basis of this litigation, but apparently only a list with each plaintiff's name was furnished. After checking its own records, BCBSM was unable to identify relevant claims that were denied to these three individuals. Without any evidence of disputed payments, summary judgment on the claims of Buck, Miller, and Morris was appropriate.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the order of the district court.